UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

—————————————————————————
                                                        :
UNITED STATES OF AMERICA                                :
                                                        :        Criminal No. 04-CR-580 (JLL)
                                                        :
                    v.                                  :
                                                        :                OPINION
                                                        :
CHARLES KUSHNER                                         :
                                                        :        LINARES, District Judge
—————————————————————————


**INTRODUCTION**

This matter is before the Court on the motion of the Newark Morning Ledger Company and North Jersey Media Group Incorporated ("Media Intervenors") to intervene in the instant action and to obtain access to all sentencing letters and sentencing memoranda submitted to the Court. There was no oral argument. See Fed. R. Civ. P. 78. For the reasons set forth below, which elaborate upon the Court's Order of December 30, 2004, Media Intervenors' motion is GRANTED IN PART and DENIED IN PART.


**BACKGROUND**

Defendant is a prominent real estate developer, political fund-raiser, and philanthropist in the State of New Jersey. On August 18, 2004, he pled guilty to sixteen counts of tax fraud, one count of witness retaliation, and one count of making false statements to the Federal Election Commission. Defendant's renown and the sensational nature of certain of his offenses have aroused fervent media interest in this action. Consequently, shortly after the Government and

1

defendant filed their sentencing memoranda with the Court,[1] Media Intervenors made the instant application to intervene and access all such filings. Of particular interest to Media Intervenors, and the core focus of this Opinion, are the roughly 750 letters submitted to the Court on defendant's behalf, all requesting leniency.[2] Virtually every one of these letters – 746 of them – were compiled by defense counsel and submitted with defendant's sentencing memorandum.

In their moving papers, Media Intervenors argue that, under the common law right of access to judicial records, the sentencing memoranda and letters carry a strong presumption of public access. The countervailing interests, Media Intervenors submit, are not compelling enough to overcome this presumption. Defendant opposes the motion, contending that "humanitarian considerations" counsel in favor of confidentiality, as many of the letters involve highly personal information about family affairs, illness, and the like. He argues, through counsel, that confidentiality will have little impact on the public's right to be informed, because the sentencing will be open to the public.

On December 30, 2004, the Court entered an Order granting Media Intervenors' motion to intervene and allowing access to the sentencing memoranda and certain of the letters.[3] The

---

[1]The documents discussed in this Opinion were forwarded directly to the Court and were not filed with the Clerk of the Court.

[2]The Court did receive one letter urging the Court to impose a more severe sentence.

[3]The full text of that Order is as follows:

> The Court having considered the motion of the Newark Morning Ledger Company and North Jersey Media Group Incorporated ("Media Intervenors") to (1) intervene in the instant action and (2) obtain access to all sentencing letters and sentencing memoranda submitted to the Court,
> > IT IS on this **30th** day of **December**, **2004**,
> > **ORDERED** that

Court indicated in said Order that this Opinion would follow.

## **DISCUSSION**

I.    Media Intervenors' Motion to Intervene

Preliminarily, the Court must address Media Intervenors' standing.  As the Court shall discuss fully below, the public and media enjoy a qualified right of access to judicial records. Having such a protected interest, Media Intervenors are entitled to "notice and an opportunity to be heard at a meaningful time, and in a meaningful manner" before they can be deprived of that interest.  United States v. Antar, 38 F.3d 1348, 1361 n.18 (3d Cir. 1994); see also United States v. Raffoul, 826 F.2d 218, 224 (3d Cir. 1987).

---

(1) Media Intervenors' motion to intervene is GRANTED;

(2) the Government's sentencing memorandum, with appropriate redactions in order to preserve the confidentiality of grand jury matters, ongoing investigations, and otherwise sensitive information, shall be made available;

(3) defendant's sentencing memorandum shall be made available;

(4) letters excerpted or explicitly referenced in defendant's sentencing memorandum shall be made available;

(5) letters submitted by current and former public officials shall be made available;

(6) letters other than those excerpted or explicitly referenced in defendant's sentencing memorandum and those submitted by current and former public officials, whether submitted directly to the Court or by counsel, shall not be made available, subject to the Court's explicit reliance on individual letters during the sentencing proceedings, which letters shall be made available at that time; and

(7) letters other than those excerpted or explicitly referenced in defendant's sentencing memorandum and those submitted by current and former public officials, whether submitted directly to the Court or by counsel, to which the Court makes reference during the sentencing proceedings, but only with respect to the sheer quantity of said letters rather than individual content, shall not be disclosed.

The Court will file an Opinion elaborating upon this Order.

(Linares, J., Order of 12/30/04.)

The instant motion was submitted on or about December 14, 2004.  With the sentencing hearing scheduled for January 18, 2005, the value of the information sought is now at its most robust.  The process "due" Media Intervenors must therefore be afforded imminently, before the information grows "increasingly stale."  <u>Antar</u>, 38 F.3d at 1361.  Accordingly, because Media Intervenors enjoy a qualified right of access to public records, and the value of those records to civic discourse will soon erode, their motion to intervene is GRANTED.

II.    <u>Media Intervenors' Motion to Obtain Access to Sentencing Memoranda and Letters</u>

   A.    *Overview of the Legal Standards Concerning Access to Judicial Records*

The precise contours of the public's right (if any) to access sentencing letters have not been delineated by any reported case in the Third Circuit.  Nevertheless, it appears clear that the issue should be analyzed within the framework of two established doctrines, to wit, the First Amendment right of access to judicial proceedings, and the common law right of access to judicial documents.  The Court addresses these concepts in turn.

   1.    First Amendment Right of Access to Judicial Proceedings

The Supreme Court recognized a First Amendment right to attend criminal trials in <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 580 (1980) (plurality opinion).[4]  "In guaranteeing freedoms such as those of speech and press," Chief Justice Burger reasoned, "the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees."  <u>Id.</u> at 575.  These freedoms become attenuated unless

_____

   [4]While no majority opinion was filed in <u>Richmond Newspapers</u>, seven Justices recognized the right.  <u>See</u> <u>Globe Newspaper Co. v. Superior Court</u>, 457 U.S. 596, 603 (1982) (reaffirming <u>Richmond</u>'s recognition of the right).

courts are prohibited "'from limiting the stock of information from which members of the public

may draw.'" Id. at 575-76 (quoting First Nat'l Bank of Boston v. Belloti, 435 U.S. 765, 783

(1978)).  In a concurring opinion, Justice Brennan emphasized that, while in practice the First

Amendment serves to protect communication between individuals, "the First Amendment

embodies more than a commitment to free expression and communicative interchange for their

own sakes; it has a structural role to play in securing and fostering our republican system of self-

government." Id. at 586-87 (emphasis in original), quoted by United States v. Smith, 776 F.2d

1104, 1108 (3d Cir. 1985) ("Stoneman").

     In subsequent cases, the Supreme Court elucidated the right of access to criminal trials,

most notably in Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ("Press-Enterprise

II").  Drawing from Richmond Newspapers and its progeny, Press-Enterprise II extended the

right of access beyond the trial itself and applied it to preliminary hearings.  See id. at 10.  The

Court reasoned that if a particular proceeding passed the "tests of experience and logic" – that is,

if the proceeding has historically been open to the public, and if "public access plays a significant

positive role in the functioning of the particular process" – a "qualified First Amendment right of

public access attaches." Id. at 8-9.  This qualified right of access can only be overcome "'by an

overriding interest based on findings that closure is essential to preserve higher values and is

narrowly tailored to serve that interest.'" Id. at 9 (quoting Press-Enterprise Co. v. Superior

Court, 464 U.S. 501, 510 (1984) ("Press Enterprise I")).

     The Supreme Court has not ruled on whether the First Amendment right of access to

criminal proceedings extends to court documents as well.  However, the Third Circuit has

answered the question in the affirmative.[5]  In Stoneman, the Third Circuit opined that the

analysis under Richmond Newspapers and Press-Enterprise I & II concerning access to judicial

proceedings applies with equal force to the issue of access to judicial documents.  776 F.2d at

1111-12.  Finding that criminal indictments have been historically accessible, and that such

access is essential to public understanding and evaluation of criminal trials, Stoneman held that

there was a First Amendment (and common law) right of access to bills of particulars, which the

court deemed tantamount to indictments.  Id. at 1112.

Nevertheless, the circuit court upheld the district judge's sealing of the bill of particulars.

The bill at issue listed names of unindicted individuals who, in the opinion of the U.S. Attorney,

"conceivably may have" been co-conspirators.  Id. at 1114.  Given the less than exacting standard

for being named as a co-conspirator on this list, the court acknowledged that public disclosure

could have destroyed the careers of innocent individuals and thus viewed the countervailing

privacy and reputational interests as sufficiently compelling.  Id.  Also, the trial judge was held to

have narrowly tailored his protective order to include only the co-conspirator list.  Id.  As a

result, Stoneman, while extending the First Amendment right of access to judicial documents,

found no constitutional violation on the record before it and affirmed the district court.  Id. at

1115.

---

[5]Other Circuits have similar jurisprudence in this respect.  For example, the Second
Circuit, applying the "higher values/narrow tailoring" test of Press-Enterprise II, has found the
First Amendment right of access to extend to exhibits at a suppression hearing, see In re Herald
Co., 734 F.2d 93, 101 (2d Cir. 1984), motion papers, In re New York Times, 828 F.2d 110, 114
(2d Cir. 1987), plea agreements, United States v. Haller, 837 F.2d 84 (2d Cir. 1988), and
Criminal Justice Act forms, United States v. Suarez, 880 F.2d 626, 631 (2d Cir. 1989).  The
Fourth Circuit has similarly held that documents filed in connection with plea and sentencing
hearings in criminal cases are accessible on First Amendment grounds.  In re Washington Post
Co., 807 F.2d 383, 390 (4th Cir. 1986).

Thus, the Third Circuit's First Amendment jurisprudence in the public access realm appears to employ strictly the "experience and logic" test of <u>Press-Enterprise</u>.  Moreover, it recognizes that interests of privacy and reputation can be compelling enough to overcome the constitutional right of access, a right which, when it attaches, is extremely difficult to surmount. The Court now turns to the second doctrine, the common law right of access to judicial records.

### 2.      Common Law Right of Access to Judicial Records

The common law right to inspect and copy judicial records predates the Constitution and was formally recognized in <u>Nixon v. Warner Communications, Inc.</u>, 435 U.S. 589 (1978).  It is rooted in many of the same principles that form the basis of the First Amendment right, including the need for accountability of the otherwise independent judiciary, the need of the public to have confidence in the effective administration of justice, and the need for civic debate and behavior to be informed if it is to have value.  <u>United States v. Criden</u>, 648 F.2d 814, 820-21 (3d Cir. 1981) ("Criden I"); <u>United States v. Amodeo</u>, 71 F.3d 1044, 1048 (2d Cir. 1995).  A qualified right of access attaches automatically to all judicial records, without a showing of any particularized need.  <u>See</u> <u>Nixon</u>, 435 U.S. at 597-98.  What constitutes a "judicial record" hinges on "whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings."  <u>In re Cendant Corp.</u>, 260 F.3d 183, 192 (3d Cir. 2001).

Notwithstanding the "automatic" nature of this right of access, it is not absolute.  This is so, because "[e]very court has supervisory power over its own records and files," and access to records can be properly denied "where court files might have become a vehicle for improper purposes" – for example, "to gratify private spite or promote public scandal."  <u>Nixon</u>, 435 U.S. at

603 (internal quotes and citations omitted).  <u>Nixon</u> recognized that, while a comprehensive

definition of the common law right is unavailable, it is universally accepted that "the decision as

to access is one best left to the sound discretion of the trial court, a discretion to be exercised in

light of the relevant facts and circumstances of the particular case."  <u>Id.</u> at 598-99.

       In <u>Criden I</u>, the Third Circuit had occasion to address the common law right of access in

the context of video tapes admitted into evidence during the well-publicized "Abscam"

prosecutions.  The tapes at issue had been played in open court before the jury, and the disclosure

issue focused on the right to rebroadcast them to the public.  <u>See</u> 648 F.2d at 822.  The district

court denied the intervening broadcasters' application to copy and distribute the tapes on the

grounds, <u>inter alia</u>, that the rebroadcast would taint the jury pool in the event of retrial and unduly

punish innocent third parties.  <u>Id.</u> at 816.  On appeal, the circuit court held "that there is a strong

presumption that material introduced into evidence at trial should be made reasonably accessible

in a manner suitable for copying and broader dissemination."  <u>Id.</u> at 823.  This "strong

presumption" was based on two factors: first, the common law right of access to judicial records

identified in <u>Nixon</u>, and second, "the significant interest of the public in observation,

participation, and comment on the trial events."  <u>Id.</u>; <u>accord</u> <u>United States v. Martin</u>, 746 F.2d

964, 968 (3d Cir. 1984).  Because the district court gave insignificant weight to these two factors,

the circuit court remanded with instructions to grant the broadcasters' application, "except for

that material which the district court explicitly determines to be impermissibly injurious to third

parties."  <u>Criden I</u>, 648 F.2d at 829.  That injury was loosely defined as the infliction of

"unnecessary and intensified pain," which may justify denial of rebroadcast for the benefit of

"third parties the court reasonably finds are entitled to such protection."  <u>Id.</u>

8

On remand, the district court permitted the broadcasters to copy and disseminate the tapes, but with blanket instructions that all portions making reference to individuals or entities not named as defendants in the underlying prosecution were to be excised. The broadcasters again appealed the order, and again they prevailed. The circuit court found such broad redactions, which amounted to roughly twenty percent of the taped conversations, to nullify its previous ruling. United States v. Criden, 681 F.2d 919, 921 (3d Cir. 1982) ("Criden II"). The court then undertook to make the redactions itself. Id. at 922. Interestingly, its sole comment on the substance of the videotapes consisted of the following: "Very few of the references to third parties, albeit unflattering, and we may assume false, rise to the level of 'intensified pain', as distinguished from mere embarrassment, which would warrant deletion from the tapes themselves, particularly because the transcripts of these conversations are already public information." Id.

Two years later, in United States v. Martin, the Third Circuit addressed the issue of whether the common law right of access to judicial records extended to documents not admitted into evidence – in that case, transcripts given to jury members of recorded conversations that were played in open court. The district court had denied media access to these transcripts, in part because the transcripts were not part of the evidentiary record. The circuit court reversed, holding that, while Criden I applied only to evidence admitted at trial, the common law right does extend to judicial records and materials other than evidence. Martin, 746 F.2d at 968-69. Both Criden I factors, the common law right of access and the public interest in observing and commenting upon the trial, were held to support a strong presumption of access. Id. at 968.

Shortly after Martin, the circuit court held, in United States v. Smith, 787 F.2d 111, 115

9

(3d Cir. 1986), that the right of access extends to transcripts of sidebar or chambers conferences in criminal cases at which rulings have been made.  Analyzing the issue under the First Amendment, the court reasoned that, while exclusion of the press and others from such conferences may be justified, "the public interest in the ruling is not diminished."  Id. at 114.  "At some stage ... that ruling must be available for public review so that the purposes of open trials can be satisfied."  Id.  When contemporaneous observation of the conference is precluded, the court explained, the common law right of access to the transcript becomes the "next best" way to vindicate the public interest under the First Amendment; ergo, the common law right extends to the transcripts.  Id.  In this way, the common law and First Amendment rights interact, with the former filling gaps left open by the latter.

            3.     Case Law Concerning Sentencing Letters

        There are very few reported cases involving public access to sentencing letters; however, those that do exist are edifying.  In United States v. Boesky, Judge Lasker of the Southern District of New York denied a motion by newspaper intervenors to access the pre-sentence report and sentencing letters in the criminal prosecution of Wall Street arbitrageur Ivan Boesky.  674 F. Supp. 1128, 1130 (S.D.N.Y. 1987).  Judge Lasker rejected the intervenors' First Amendment argument.  In so doing, he relied on United States v. Charmer Indus., Inc., 711 F.2d 1164, 1175 (2d Cir. 1983), which held that pre-sentence reports were not accessible to the public absent a "compelling demonstration that disclosure ... is required to meet the ends of justice."  Treating the pre-sentence report and the sentencing letters as one and the same,[6] he articulated the policy

_____

        [6]It is noteworthy that all the sentencing letters "attached" to the defendant's sentencing memorandum were not "in contention," 674 F. Supp. at 1128, presumably meaning that the

behind the <u>Charmer</u> rule:

> The reason for this policy is not capricious.  It is to protect the confidentiality of those furnishing information to the Probation Officer who makes up the pre-sentence report, thereby encouraging the frankness of informants, and the availability of such information.  The policy for preserving the confidence of the documents may be appropriately compared to the policy of so-called shield statutes which have been enacted to protect a reporter from having to reveal his sources.

<u>Boesky</u>, 674 F. Supp. at 1130.[7]

Applying <u>Charmer</u> to the report and letters before him, Judge Lasker reasoned that the public would be "thoroughly informed" about the circumstances of the defendant's sentencing, owing to the availability of sentencing transcripts and the openness of the actual sentencing.  <u>Id.</u> The intervenors were thus found to have failed to demonstrate a compelling need for disclosure to meet the ends of justice.

A more recent case involving sentencing letters, also in the Second Circuit, was <u>United States v. Lawrence</u>, 167 F. Supp. 2d 504 (N.D.N.Y. 2001).  In <u>Lawrence</u>, newspaper intervenors, arguing under both the First Amendment and common law standards, sought access to sentencing letters reviewed by the court in sentencing the defendant.  <u>Id.</u> at 506.  Chief Judge Scullin rejected the First Amendment argument, reasoning that, <u>inter alia</u>, sentencing documents have not been historically accessible to the public.  <u>Id.</u> at 508.  He likened sentencing letters to pre-

---

parties did not dispute that these letters were publicly accessible.

[7]At least one court in the Third Circuit has adopted the <u>Charmer</u> standard.  <u>See United States v. Harrison</u>, No. 92-543-1, 2003 U.S. Dist. LEXIS 7733, at *1-2 (E.D. Pa. May 7, 2003); <u>cf. United States v. Cianscewski</u>, 894 F.2d 74, 79 n.17 (3d Cir. 1990) (citing <u>Charmer</u>, 711 F.2d at 1169-71, for proposition that the "presentence report has always been considered a confidential document").

sentence reports, adopting <u>Boesky</u>'s analysis.[8]  <u>Id.</u> at 507-08.  Judge Scullin further analogized these letters to grand jury materials, in that they "contain unsubstantiated opinions, expressions as to the character of Defendant and others and, in some instances, could contain damaging, and possibly untrue, allegations and statements that are not subject to cross-examination."  <u>Id.</u> at 508 n.7.

With respect to the common law argument, Judge Scullin held that the presumption of access was overcome in that case by privacy interests, noting that "the weight given the presumption of access is governed by how pivotal the document in question was to the exercise of Article III power."  <u>Id.</u> at 509.  As the letters mailed to the court "did not play a significant role" in the sentencing decision, the judge denied the motion.  <u>Id.</u>

There are two additional concepts introduced by <u>Lawrence</u> which warrant special comment.  First, Judge Scullin declined to disclose certain letters even though he had referenced these generally at the hearing, reasoning that, rather than relying on specific content, he had relied on the "the sheer quantity of letters supporting Defendant."  <u>Id.</u>  Given that the press was "thoroughly informed at the sentencing hearing of the nature and quantity of the letters," Judge Scullin found "no need to violate the writers' legitimate expectation of confidentiality."  <u>Id.</u> Second, Judge Scullin did disclose one letter from which he had actually quoted at the sentencing hearing, but he redacted the identity of the author.  <u>Id.</u> at 509 n.10.  These actions reflect a delicate balancing whereby privacy concerns and the avoidance of even the remotest chilling

---

[8]Notably, however, Judge Scullin held, as did <u>Boesky,</u> that letters attached or expressly referenced in defendant's sentencing memorandum were indisputably accessible, as would be "any document filed with the Clerk of the Court in any matter before the Court (other than those filed under seal)."  167 F. Supp. 2d at 506 & n.2.

effect appear to be weighted quite heavily.

Most recently, the issue of access to sentencing letters arose in United States v. Gotti, 322 F. Supp. 2d 230 (E.D.N.Y. 2004).  There, Judge Block held, in what seems to be the most comprehensive opinion on the topic to date, that no First Amendment right of access existed with respect to sentencing letters, as such letters were neither historically made available, nor logically accessible owing to the chilling effect such disclosure would have upon the sentencing process. Id. at 249-50.  Moreover, he did not find the letters to be "a necessary corollary to attending the sentencing proceeding since they [had] nothing to do with the ability of the public and press to attend civil and criminal cases."  Id. at 250 (internal quotes and citation omitted).

In contrast to Boesky and Lawrence, Judge Block found sufficient distinctions between pre-sentence reports and sentencing letters sent directly to the court; thus, he held the heightened Charmer standard inapplicable.  Unlike pre-sentence reports, which are executive in function because they are filtered through the Probation office, he reasoned that the letters sent to the court are meant to impact directly upon the judge's sentence and thus implicate Article III duties. See id. at 249.  Therefore, he found that "they are the functional equivalent of being physically filed with the court," which effectively renders them judicial records.  Id. (internal quotes and citation omitted).

As a result, Judge Block found the common law right of access best suited as the analytical framework for this issue, since "it embraces both the public's right to be assured that the court is appropriately attending to its judicial responsibilities and the privacy interests of third parties."  Id. at 250.  However, as applied to the facts before him, Judge Block deemed the presumption of access overcome by the countervailing factors, which included the lack of weight

13

he accorded the letters, the sensationalistic nature of those letters, and the emotional instability of one of the letter's authors.  Id.

The aforementioned analysis indicates that the courts that have grappled with the issue of public access to sentencing letters have established the following principles: (1) the First Amendment does not reach sentencing letters; (2) the common law reaches sentencing letters only to the extent these letters impacted the sentencing; (3) privacy interests are given substantial weight in the common law balancing test; and (4) sentencing letters "attached" to or referenced in defendant's sentencing memorandum are invariably disclosed, as they are part of the public record.  A review of the cases, however, also makes it clear that it is unsettled whether sentencing letters not included with the sentencing memorandum should be treated as pre-sentence reports and therefore subject to the more onerous "ends of justice" test under Charmer, or whether these are ordinary judicial records subject to the balancing test under the common law.

> B.    *Application of the Law to the Instant Case*

Before applying the preceding legal principles to the sentencing letters in this case, the Court must address a threshold issue, namely, whether the parties' submissions to the Court, despite not having been filed with the Clerk of the Court, are nonetheless, solely by virtue of having been compiled and submitted by counsel to the Court for its consideration, judicial records.

As discussed, the inquiry into whether a document in the Court's possession is a "judicial record" or not depends on "whether a document has been filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings."  Cendant,

14

260 F.3d at 192 (finding that bids submitted to court for the purpose of selecting lead counsel in

class action were transformed into judicial documents, as the court had ordered the submissions

and based its ruling upon them). A document becomes integrated into court proceedings when,

for example, it is "placed under seal, interpreted or enforced" by the Court. Pansy v. Borough of

Stroudsburg, 23 F.3d 772, 781 (3d Cir. 1994) (quoting Enprotech Corp. v. Renda, 983 F.2d 17,

20 (3d Cir. 1993)), cited by Cendant, 260 F.3d at 192. Moreover, regardless of whether the

Court incorporates a document into a particular proceeding, Local Civil Rule 79.2 provides that,

"[a]lthough not filed with the Clerk, all briefs, unless otherwise ordered by the Court, shall

constitute parts of the public record" and should be made available to the public.[9]  Rule 79.2 does

not, however, render exhibits attached to briefs part of the record, as these must be filed with the

Clerk. See, e.g., Miller v. McMann, 89 F. Supp. 2d 564, 569 n.5 (D.N.J. 2000).

      The submissions here were not filed with the Clerk; however, the sentencing memoranda,

clearly being "briefs," are ipso facto part of the public record. See L. Civ. R. 79.2.  The

sentencing letters, on the other hand, albeit having been neatly packaged and submitted with the

memoranda, were not filed with the Clerk and do not automatically become judicial records

merely by virtue of their mode of delivery.[10]  See Miller, 89 F. Supp. 2d at 569 n.5.

      1.     First Amendment

---

[9]Rule 79.2 applies in criminal actions.  See L. Cr. R. 1.1.

[10]Whether the sentencing letters are ultimately deemed judicial records as a result of their importance to these proceedings is a separate matter and will be addressed below.  Moreover, the Court reiterates that merely because a document, such as a sentencing memorandum, is ruled a judicial record does not mean that it will necessarily be made available for public consumption. It means only that a presumption, of whatever strength, attaches.

While Media Intervenors did not rely upon the First Amendment in their motion, the Court's December 30, 2004 Order withholds certain letters from the press, and thus it is appropriate to comment on why said Order of non-disclosure comports with the Constitution.

The First Amendment does not afford Media Intervenors access to the sentencing letters, because these documents fail the "experience and logic" test of Press-Enterprise II.  See 478 U.S. at 8-9.  First, insofar as sentencing letters have ever been disclosed to the public, that disclosure was certainly not rooted in Anglo-American tradition.  See Gotti, 322 F. Supp. 2d at 249-50 (citing Charmer, 711 F.2d at 1175).  Second, access would not only fail to play a positive role in the functioning of sentencing proceedings, it would hamper them.  The free flow of these letters to the Court, unimpeded by the chilling effect of disclosure to the press, is crucial to the goal of achieving a just sentence.  A policy of general disclosure would surely impact the frankness of the letter-writers and their willingness to participate at all.  See Boesky, 674 F. Supp. at 1130; accord Lawrence, 167 F. Supp. 2d at 508.  Thus, neither "experience" nor "logic" support a qualified First Amendment right of access.  The Court now turns to the common law doctrine.

> 2.      Common Law

This Circuit has unquestionably recognized a "strong" presumption of access – indeed, one that is extremely difficult to surmount – when certain criteria are satisfied.  Nevertheless, in attaching a presumption of such strength when merited, the circuit court has also acknowledged that the strength of the presumption may vary, depending on the factors that gave rise to the presumption.  Third Circuit jurisprudence indicates a continuum whereon the strength of the presumption of access can be measured, albeit imprecisely.

The presumption of access under the common law arises from two antecedents, and the

nature of these suggests the existence of such a continuum.  The first is the general common law

right itself recognized in Nixon; the second is the public interest "in observation, participation,

and comment on the trial events."  Criden I, 648 F.2d at 823; accord Martin, 446 F.2d at 968.  It

appears that the first of these sources is somewhat static, being that it is a doctrine rather than a

fact-specific test.  So long as the document in question qualifies as a judicial record, the general

right to access applies.  See Martin, 446 F.2d at 968.  The second source, however, clearly

involves substantive and subjective analysis on a case-by-case basis.  The analysis entails

determining how the public's interest, in light of the underlying reasons for the common law

right as articulated in Richmond Newspapers and Nixon, "can best be vindicated."  Id. at 968-69;

Criden I, 648 F.2d at 819-23.  Therefore, the presumption cannot be of singular strength under

every conceivable circumstance, because the public will have differing levels of exposure to the

proceedings at issue, some more conducive to full vindication of the varied public interests, and

some less.  See Cendant, 260 F.3d at 193 (holding that, because many members of the public

were also class members, "all the reasons ... for the right of access to public records apply with

even greater force here").

The cases in which the Third Circuit has applied a "strong" presumption support this

notion.  Seemingly every one involves the accessibility of documents that directly impacted and

were crucial to the district court's exercise of its Article III duties.  See, e.g., Criden I, 648 F.2d at

823 (tapes introduced into evidence and played in open court for jury); Martin, 446 F.2d at 968-

69 (transcripts provided to jury of recordings played earlier in open court);[11] Smith, 787 F.2d at

[11]Although the court deemed the level of public interest in a trial unimportant, Martin did
engage in a factual analysis to determine that the case before it was "of extraordinary moment,
and that the presumption in favor of access to trial materials is no weaker here than it was in

115 (transcripts of sidebar proceedings that resulted in court rulings); <u>Cendant</u>, 260 F.3d at 192

(bids submitted to court, by its order, upon which it relied in selecting lead class counsel);

<u>Stoneman</u>, 776 F.2d at 1112 (indictments and bills of particulars); <u>Bank of Am. Nat'l Trust &</u>

<u>Savings Ass'n v. Nilsi, N.V.</u>, 800 F.2d 339, 345 (3d Cir. 1986) (settlement agreement of which

parties sought interpretation and enforcement by court).  While these documents all surely

justified such a strong presumption, other documents, like discovery materials, <u>see</u> <u>Leucadia, Inc.</u>

<u>v. Applied Extrusion Techs., Inc.</u>, 998 F.2d 157, 164-65 (3d Cir. 1993) (refusing to extend public

access to discovery motions and materials), or sentencing letters, potentially have far less

relevance to the court's functioning.  The strength of the presumption as to these documents

should fall toward the weaker end of the continuum, until at some point they are not judicial

documents at all.  <u>See</u> <u>Pansy</u>, 23 F.3d at 781 (holding that settlement agreement not interpreted or

enforced by court is not judicial record).

   The Second Circuit has succinctly articulated the conclusion to be drawn from the above

analysis:

> We believe that the weight to be given the presumption of access must be
> governed by the role of the material at issue in the exercise of Article III judicial
> power and the resultant value of such information to those monitoring the federal
> courts.  Generally, the information will fall somewhere on a continuum from
> matters that directly affect an adjudication to matters that come within a court's
> purview solely to insure irrelevance.

---

<u>Criden I</u>."  746 F.2d at 969.  Had the court believed that the presumption of access could not
differ in strength from case to case, it would not have entertained such an analysis.  Moreover,
<u>Martin</u> qualified the breadth of its ruling: "In so holding we do not suggest that the fact that
requested materials are not in evidence can never be a <u>relevant</u> consideration; we hold only that
the district court erred in treating it as a <u>dispositive</u> consideration."  <u>Id.</u> (emphasis in original).
Presumably, then, a document's respective absence from the evidentiary record could weaken its
presumptive accessibility.

Amodeo, 71 F.3d at 1049.

Criden I stated that, "[o]bviously, the strength of the presumption can be effectively considered only in relationship to the factors which would justify denial of the application." 648 F.2d at 823. The Court will now consider the presumption of access in relation to those factors in the instant case. In so doing, the Court will move along the continuum, starting with the documents that carry the strongest presumption of access and proceeding towards those with the weakest. The following is a hierarchy of the sentencing materials at issue in this case, from the most presumptively accessible to the least.

a.      Sentencing Memoranda

It is settled that a strong presumption of access attaches to sentencing memoranda. Sentencing memoranda are indisputably judicial records, as these are either filed with the Court, see Cendant, 260 F3d at 192, or as briefs rendered part of the public record, L. Civ. R. 79.2. Moreover, these may on occasion serve as a basis for judicial departure from the sentencing guidelines, thereby bearing directly upon the Court's Article III duties in the criminal justice arena, perhaps the most important of judicial duties. See United States v. Chang, 47 Fed. Appx. 119, 122 (3d Cir. 2002).[12]

The sentencing memoranda before the Court are no exception. The Court will undoubtedly rely heavily on the memoranda submitted by both sides, and these will most certainly impact the ultimate sentence. Defendant's argument for closure, namely, that the

---

[12]While Chang was an unpublished opinion with no precedential value, 47 Fed. Appx. at 121, the Court adopts it. It is both highly persuasive and instructive as to how the Third Circuit might analyze the issues before the Court.

privacy of the letter-writers mentioned in his memorandum should be respected, is to no avail.  It was defendant who utilized, and asked the Court to rely on, these individuals' letters in tailoring his arguments to the Court for leniency.  See Bank of Am., 800 F.2d at 345.  Also, at the sentencing hearing, which will be open to the public, the Court will likely ask defendant's counsel to elaborate upon the arguments made in the memorandum.  Taking defendant's argument to its logical conclusion, he would have the Court effectively impose upon itself and all participants a gag order as to the individuals mentioned in the document.  This is neither appropriate nor logical.  Therefore, Media Intervenors' motion to obtain access to the sentencing memoranda is GRANTED.[13]

> b.    Letters Referenced in Sentencing Memoranda

For the reasons set forth above concerning the presumptive accessibility of sentencing memoranda, the strong presumption of access attaches to any letters excerpted or explicitly referenced in defendant's memorandum.  See Lawrence, 167 F. Supp. 2d at 506 & n.2.  Again, these letters have been, by defendant's choice, thrust into the public domain by virtue of their inclusion in a public document that counsel will be called upon to defend in public.  The public nature of these letters renders the distress, if any, experienced by the writers insufficient to overcome the presumption of access.  See Criden II, 681 F.2d at 922 (holding that "mere embarrassment," even if resulting from false statements, is not enough to rebut strong presumption, "particularly because the [documents] are already public information").  Media

---

[13]The Government, of course, shall redact any material relating to grand jury proceedings.  See Fed. R. Cr. P. 6(e); Chang, 47 Fed. Appx. at 121.  Moreover, the Government is permitted to excise all material that may compromise ongoing investigations and the like.

Intervenors' motion to obtain access to the sentencing letters is GRANTED insofar as the letters are excerpted or explicitly referenced in defendant's sentencing memorandum.

### c.      Letters Explicitly Relied Upon by the Court

The next category of documents are those letters that the Court makes explicit reference to at the hearing as playing a role in the judicial formulation of its sentence.  A strong presumption of access must attach to these as well.  If the Court relies on such letters in its administration of justice, Article III duties are clearly implicated directly.  See Chang, 47 Fed. Appx. at 122; Gotti, 322 F. Supp. 2d at 250; Lawrence, 167 F. Supp. 2d at 508.  Indeed, were the Court to single out, from hundreds of letters submitted, a particular missive and describe its contents and influence upon the Court in the imposition of a given sentence, that would surely reflect an overwhelmingly powerful presence within the judicial decision-making process and create a presumption of access exceedingly difficult to overcome.  Such a letter would be tantamount to evidence, and again, more than third-party embarrassment must be present to defeat the resulting presumption.  See Criden II, 681 F.2d at 922.

There are no circumstances in the instant case that overcome this strong presumption. Specifically, while many of the letters involve illnesses and deaths in which defendant became positively involved, the Court cannot, in light of Criden II, shield these innocent third parties from the emotional pain that might result from disclosure, because such letters may serve as the basis for the imposition of a particular sentence.[14]  See id.  Accordingly, Media Intervenors'

---

[14]The Court can conceive of situations where the anguish potentially suffered through disclosure would warrant, at the least, redaction of the identity and address of the individual letter-writer.  See Lawrence, 167 F. Supp. 2d at 509 n.10.  The Court at this time, however, is unaware of which letters it will explicitly discuss at the hearing and is therefore unable to make

motion to obtain access to sentencing letters is GRANTED – in the absence of extraordinary privacy concerns that may ripen at the sentencing hearing – insofar as the Court explicitly relies on any particular letter as a consideration in the imposition of sentence.

d.     <u>Letters Submitted by Public Officials</u>

While letters submitted by public officials do not <u>per se</u> implicate the Court's oversight of the sentencing process – unless the Court relies on these, in which case they would fall under the previous category – the Court finds that the presumption of access should nevertheless attach with some strength.  The public has a strong interest in the use officials make of their positions of public trust.  <u>See</u> <u>Gotti</u>, 322 F. Supp. 2d at 247, 251.  Further, those officials' privacy interests are at best tenuous when they try to bring their public power to bear upon sentencing proceedings. <u>See</u> <u>Smith</u>, 787 F.2d at 116; <u>Chang</u>, 47 Fed. Appx. at 123; <u>cf.</u> <u>Pansy</u>, 23 F.3d at 788 (holding that courts should consider whether party benefitting from closure is public or private entity when conducting "good cause" balancing test incident to issuance of confidentiality rulings).

To be sure, there may be circumstances that would warrant non-disclosure or redaction, such as when the official's letter does not implicate his or her public position and otherwise bears "an air of confidence."  <u>United States v. Corbitt</u>, No. 87-CR-378, 1988 WL 94278, at *9 (N.D. Ill. Aug. 24, 1988) (citing <u>Boesky</u>, 674 F. Supp. at 1129), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> 879 F.2d 224 (7th Cir. 1989).  In these circumstances, since Article III powers themselves are not implicated, thus rendering the presumption somewhat weaker, the Court would have a bit more discretion to withhold such letters.  In the instant case, however, circumstances justifying denial

such a factual finding at this time.

of access are not present.  Each of the three letters the Court has received from current officeholders explicitly references the writer's office, and while certain portions of these letters are of a somewhat personal nature, there are no indicia of an expectation of confidentiality. Media Intervenors' motion to obtain access to the sentencing letters is therefore GRANTED insofar as these are submitted by holders of public office.

e.      Letters Submitted by Former Public Officials

Letters submitted by former officials obviously lack the public trust component of the previous category, and the presumption here is further along the continuum.  Nevertheless, when considered against the factors that would justify closure, see Criden I, 648 F.2d at 823, the Court finds that these letters are presumptively accessible.

The main reason for this conclusion is that, in light of the fact that the factors counseling against disclosure in the context of sentencing letters mostly stem from privacy interests, former public officials have a greatly diminished expectation of privacy.  Cf. id. at 829; Smith, 787 F.2d at 116; Amodeo, 71 F.3d at 1050-51.  They additionally have more extensive means at their disposal than private individuals for clarifying the substance of their letters, their motives, and the like.  Cf. Curtis Publ'g Co. v. Butts, 388 U.S. 130, 164 (1967) (Warren, C.J. concurring) ("'[P]ublic figures,' like 'public officials,' often play an influential role in ordering society.  And surely as a class these 'public figures' have as ready access as 'public officials' to mass media of communication, both to influence policy and to counter criticism of their views and activities.").

Closure of these letters will undoubtedly be more frequent than closure of letters written by public officials, in light of the weaker presumption to be surmounted, but the instant case presents no circumstances that would justify withholding access.  The Court received four of

23

these letters, and each of these either identify the writer's former office or are written in a manner which bespeaks an expectation of public consumption.  Media Intervenors' motion is GRANTED as to these letters.

f.      Groupings of Letters Upon Which the Court Relies

The Court now arrives at the categories of documents where it deems the presumption of access either weak or non-existent.  The first of these categories consists of "groupings" of letters explicitly relied upon by the Court.  For example, if the Court stated, "I was particularly influenced by the fact that 200 individuals wrote to say that defendant provided them with financial assistance when their children fell ill," a very weak presumption of access would attach.

While Article III duties are implicated by reliance on the nature and quantity of letters, the "resultant value" of public disclosure of those letters is minimal, because the press already realizes most, if not all, of the value of the letters to the public interest when the Court describes these during the sentencing proceedings.  See Amodeo II, 71 F.3d at 1049; accord Lawrence, 167 F. Supp. 2d at 509.  Because the significance of these letters is more quantitative than substantive, their influence on the functioning of the judiciary is not as strong as that of the previous categories of documents.

The presumption being weaker, the countervailing factors need not be as compelling to overcome it.  Mindful of the considerable discretion it is afforded in this area, see Nixon, 435 U.S. at 598, 602-03; Criden I, 648 F.2d at 829, the Court concludes that two of these offsetting factors in the instant case warrant the conclusion that none of these sentencing letters should be disclosed.

The first is the privacy of the letter-writers.  The Third Circuit recognizes a compelling

third-party interest in reputation and privacy that, depending on the nature of the risk to this interest, can satisfy even the considerably more exacting standard of the First Amendment right to access.  See Stoneman, 776 F.2d at 1114 (holding that protection of reputations and careers is a higher value sufficient to overcome First Amendment presumption of access).  The privacy interests here – while probably insufficient, standing alone, to overcome the strong presumption of access applied in cases like Criden II and Martin – counsel in favor of closure as applied to this category of letters.  For example, in his sentencing memorandum, defendant excerpts two letters that recount defendant's aid to a young woman, with eight children, undergoing chemotherapy and surgery to eradicate her cancer.  (Def.'s Sentencing Mem. at 26-27.)  It is not difficult to envision members of the media, pursuing a human interest story, seeking interviews and the like with this mother and her eight children.  The letters in this particular example are of course accessible in accordance with the Court's holding above, but they are representative of the privacy interests of other individuals who have written on defendant's behalf.  In light of the fact that the Court will not rely specifically on the content of any of these letters, it would perhaps be unseemly for the Court to facilitate possible intrusions of the kind herein described, "with no corresponding assurance of public benefit."  Nixon, 435 U.S. at 603.

        The second factor, intertwined with the privacy interests, is the policy concern.  Blanket disclosure of the letters under this category risks unduly chilling the fact-gathering process ahead of sentencing.  See Boesky, 674 F. Supp. at 1130; Gotti, 322 F. Supp. 2d at 249-50.  That such an effect could imperil the due process rights of an accused is aptly illustrated by the truly unique facts of this case.  It is difficult to imagine a case presenting a wider chasm between, on the one hand, the deplorable nature of defendant's conduct, and on the other hand, the awesome breadth

of his beneficence, which only the submission of the hundreds of letters in the Court's possession

could fully illuminate.  If a general policy of disclosure were in place at the time of defendant's

guilty plea, it is quite likely that numerous of the individuals who have written on his behalf

would have declined to do so.  Given the nature of this case, it is conceivable that defendant's

ultimate sentence, whatever it may be, would have been more severe but for the outpouring of

support he has received.  Admittedly, this analysis is speculative, but in light of the uncertain

effect that disclosure of sentencing letters could have on future defendants, as well as the

historical confidentiality of such letters, these documents should generally not be accessible

under the common law unless they directly impact the Court's sentence.  See Leucadia, 998 F.2d

at 164-65 (holding that traditional unavailability of discovery materials and uncertain policy

implications warranted non-application of common law right of access).[15]

Consequently, Media Intervenors' motion to obtain access to sentencing letters is

DENIED as it pertains to letters implicated in the sentencing hearing only by reference to nature

and quantity.

### g.    Letters not Explicitly Relied Upon by the Court

The second category consists of letters upon which the Court does not rely for the

---

[15]Another policy consideration, which is not particularly germane to this case but
reinforces the Court's holding, is that the content of sentencing letters is not subject to the mill of
the truth-seeking process.  See Stoneman, 776 F.2d at 1113-14; cf. Charmer, 711 F.2d at 1175
(discussing the "frailties" of the material contained in the pre-sentence report and the similarity
of that material to grand jury material).  Accusations and other factual assertions in these letters
could prove quite harmful to third parties, who will have few means to vindicate their
reputations.

purposes of consideration and imposition of sentence.[16]  Unlike the previous category, where

Article III duties were at least nominally implicated, this category has no bearing upon the

Court's decision and thus carries little or no presumption of access.

While it could be argued that anything submitted to the Court for its consideration is a

presumptively accessible judicial document – particularly as here, where defense counsel

compiled and organized the letters[17] – such a policy would not be desirable in the sentencing

context.  As discussed with respect to the previous category, there are important countervailing

factors that, when going up against a virtually non-existent presumption of access, carry the day.

Indeed, the Court agrees with Boesky and Lawrence in concluding that sentencing letters,

at least under this category, are sufficiently analogous to pre-sentence reports to warrant similar

treatment.[18]  See Lawrence, 167 F. Supp. 2d at 507-08 (adopting Boesky's generally coextensive

treatment of sentencing letters and pre-sentence reports).  Consequently, the Court will not

---

[16]The Court does not suggest that, in not relying on a letter, it has not considered that
letter.  The reality is simply that, when hundreds of letters are presented for consideration, many
will be unpersuasive, duplicative, or irrelevant.

[17]As a practical matter, the Court attaches little significance to the fact that defense
counsel compiled the 746 letters.  If it did, future defendants predictably would refrain from
providing such efficient services, leaving the Court itself to sort through the mess.  This is
undesirable.

[18]It bears noting that the Court is not treating the pre-sentence report and sentencing
letters as one and the same.  If that were the case, the preceding analysis concerning the various
categories of sentencing materials would be null, because all sentencing letters would be subject
to the onerous presumptive-confidentiality standard under Charmer or something like it.  See
Charmer, 711 F.2d at 1175; Cianscewski, 894 F.2d at 79 n.17 (citing Charmer for proposition
that pre-sentence reports have always been confidential).  Instead, the Court has attempted to
accord similar treatment to the two groups of documents only to the extent that the underlying
policies supporting confidentiality are compatible.  See Gotti, 322 F. Supp. 2d at 249 (analyzing
difference between pre-sentence reports and sentencing letters and rejecting application of
Charmer to the former).

disclose sentencing letters upon which it did not rely in imposing the sentence, absent "a compelling demonstration that disclosure ... is required to meet the ends of justice."  <u>Charmer</u>, 711 F.2d at 1175.  There being no such demonstration in the instant case, Media Intervenors' motion to obtain access to this particular category of sentencing letters is DENIED.

## <u>CONCLUSION</u>

For the reasons set forth above, Media Intervenors' motion is GRANTED IN PART and DENIED IN PART as set forth in the Court's Order dated December 30, 2004.


DATED: January 12, 2005                                    /s/ Jose L. Linares
                                                          United States District Judge

28
